**SIGNED THIS: July 16, 2013**

_____
**Thomas L. Perkins**
**United States Bankruptcy Judge**
_____

UNITED STATES BANKRUPTCY COURT
CENTRAL DISTRICT OF ILLINOIS

| | | |
|---|---|---|
| IN RE: | ) | |
| | ) | |
| **CENTRAL ILLINOIS ENERGY** | ) | Case No.  09-81409 |
| **COOPERATIVE,** | ) | |
| | ) | |
| Debtor. | ) | |
| _____ | ) | |
| | ) | |
| **A. CLAY COX, not individually but as** | ) | |
| **trustee for the estate of Central Illinois** | ) | |
| **Energy Cooperative,** | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | Adv. No.  11-8031 |
| | ) | |
| **OBERLANDER ELECTRIC COMPANY,** | ) | |
| **an Illinois Corporation,** | ) | |
| | ) | |
| Defendant. | ) | |

## O P I N I O N

This adversary proceeding is before the Court on the amended motion for summary

judgment filed by the Defendant, Oberlander Electric Co. (OBERLANDER), on the complaint

filed by A. Clay Cox (TRUSTEE), as Trustee for the Chapter 7 estate of the Debtor, Central

Illinois Energy Cooperative (DEBTOR), seeking avoidance and recovery of certain payments made by the DEBTOR on the ground that the payments were fraudulent transfers.

*Background*

In October, 2001, a group of Central Illinois farmers banded together for a commercial purpose, forming an agricultural cooperative under Illinois law, to construct and operate an ethanol facility for the processing of its members' corn into ethanol and other byproducts. Among the founding members and incorporating directors of Central Illinois Energy Cooperative was Michael Smith, who began working for the DEBTOR in 2002 and later served as the DEBTOR'S President. The twelve incorporating directors made an initial offering in 2002 which resulted in buy-ins from four hundred members, consisting of 250 common share owners and 150 preferred investors. Early on, the members recognized that they would have to go outside the farm base to obtain additional investments. It was also contemplated that separate entities might be created in the future to own and to operate the ethanol plant, but at the early stages of the project the organizational structure remained undefined.

In 2003, the DEBTOR selected a site near Canton, Illinois. The DEBTOR entered into a general contract with Nostaw, Inc., for the construction of the grain handling facility, which was located on land adjacent to where the ethanol plant would be constructed. Central Illinois Energy, L.L.C. (CIE) and Central Illinois Holding Company, L.L.C. (HoldCo) were formed on March 22, 2004, as limited liability companies under Delaware law. HoldCo, which had been formed to operate as a parent holding company for the ownership interests of CIE, and CIE, the wholly owned operating subsidiary formed to develop, construct and operate the ethanol plant and related power facility, adopted separate operating agreements. The initial members of HoldCo included the DEBTOR, owning a 71% interest, HWS Energy Partners, LLC, Lurgi

2

PSI, Inc., Cargill Biofuels Investments, LLC, Fuel From Farmers, LLC and Whitebox CIE

Holdings, Inc.  As part of this arrangement, a capital contribution agreement was entered into

setting forth the contributions to be made by each member.  The DEBTOR, in satisfaction of

its contribution of $17,750,000 for common membership interests, agreed to contribute its

interest and rights to develop the project, prepaid development expenses, real estate and its

members' letters of credit.  In February, 2005,  the first of two Engineering, Procurement and

Construction (EPC) Agreements were entered into with Lurgi PSI, Inc., for the design and

construction of the ethanol plant.  In August of that year, a second agreement was entered into

for the design, engineering and construction of a combined heat and power plant to power the

ethanol facility.  The EPC Agreements provided for monthly progress payments to Lurgi for

the work completed and the equipment procured.

On August 15, 2005, OBERLANDER, along with two other contractors, Core

Construction, Inc. and Illinois Piping Corp., loaned the DEBTOR a total of $1,250,000, at 10%

interest, with OBERLANDER'S share of the loan being 8%, or $100,000.[1]  The note called for

the DEBTOR to make monthly payments for a period of five years, with OBERLANDER to

receive payments of $2,125.00.  Each of the three contractor/lenders withheld the first and the

second monthly payments.  The note provided for the following collateral:

> Concurrent with the execution of this Note, the undersigned has executed and delivered to payees as collateral security for the payment of this Note a first mortgage on certain real estate.  Payees agree to release said mortgage upon receipt of a firm letter of commitment from the undersigned's senior lender for the ethanol plant project, and to accept as collateral in lieu of said mortgage One Million Six Hundred Thousand (1,600,000) units of common membership interest of Central Illinois Holding Company, L.L.C.

---

[1]Core Construction's share of the note was $1,000,000 and Illinois Piping's share was $150,000.

The DEBTOR'S search for financing for the construction of the ethanol project continued. Finally, in April, 2006, financing was procured. On April 24, 2006, Credit Suisse, as agent for itself and a consortium of other lenders, entered into an $87.5 million secured credit facility with CIE and HoldCo to fund the construction of the ethanol plant and related power plant. The DEBTOR retained responsibility for constructing the grain handling facility and administration building without funding by Credit Suisse. In connection with Credit Suisse's funding of the project, OBERLANDER made a loan to HoldCo in the amount of $500,000 pursuant to a subordinated secured promissory note dated April 21, 2006 (the "HoldCo note"), the terms of which provided for payments to begin three months following the "Interim Completion" of the project, as defined in the EPC Agreement dated February 24, 2005.[2]

Although the parties do not refer to it, the Court is aware from other proceedings that various parties including the DEBTOR, OBERLANDER, Core Construction and Illinois Piping entered into a Capital Contribution Agreement dated April 21, 2006, to provide funds and other assets to HoldCo and CIE. The Agreement provides that OBERLANDER, in the form of a subordinated secured loan, will tender $500,000 in cash to HoldCo which funds will be paid to CIE as a "capital contribution." The parties offer no explanation for the loans to HoldCo/CIE or how the funds were used, but it may be reasonably inferred that Credit Suisse required these additional capital contributions as a condition of its $87 million credit facility.

Construction of the ethanol plant began in May, 2006. After an initial payment of

---

[2]The April 21, 2006, note refers to related "Other Notes" evidencing loans to HoldCo by Lurgi, Core Construction, Illinois Piping and Energy Products of Idaho. Including the $500,000 loan from OBERLANDER, the five loans total $4,815,080.

$10,625 was made to OBERLANDER on May, 30, 2006, the DEBTOR made eight additional consecutive monthly payments to OBERLANDER of $12,750, representing combined payments on the DEBTOR'S August, 2005, note and the HoldCo note, beginning on May 31, 2006, through December 2006.[3]  An additional payment in the same amount was made on March 1, 2007.  No further payments were made.

The general ledger maintained by the DEBTOR included an account for payments made by the DEBTOR for the benefit of or in satisfaction of liabilities incurred by HoldCo and reimbursements it might later receive from HoldCo for those advances.  The DEBTOR also maintained an account to keep track of monies it had paid on behalf of CIE and reimbursements which it had received from CIE.  The boards of directors of both HoldCo and CIE adopted resolutions agreeing to repay the DEBTOR for all monies advanced on their behalf with interest at 10%, from their "cash flow" before the payment of any distributions to the holders of common membership interests.

In June, 2007, the DEBTOR, experiencing financial difficulties, transferred substantially all of its assets, including the grain handling facility and numerous corn delivery contracts, to Green Lion Bio-Fuels, LLC.  That same year, as a result of a series of construction delays and cost overruns, disputes broke out between CIE and Lurgi.  Lurgi elected to stop work on the ethanol plant project in November of that year.  CIE filed a Chapter 11 petition on December 13, 2007.  Efforts to obtain debtor in possession financing were soon abandoned and CIE, pursuant to sections 363(b) and (f) of the Bankruptcy Code, negotiated an agreement with Credit Suisse for the purchase of its assets through a credit bid.  The sale was approved by the

---

[3]The dates of the subsequent payments made during 2006 are June 23, July 18, August 16, September 12, October 17, November 22 and December 8.  No explanation is offered by either party why the cash-poor DEBTOR chose to make early payments to OBERLANDER on the $500,000 note prior to Interim Completion of the ethanol plant.

Court in April, 2008.

A Chapter 11 involuntary petition was filed against the DEBTOR on May 1, 2009. The DEBTOR did not file an answer and an order for relief was entered on June 18, 2009. The case was converted to Chapter 7 on July 16, 2009, on the motion of the U.S. Trustee. Numerous adversary proceedings were brought by the TRUSTEE to recover transfers made by the DEBTOR, many of which were to recover payments made by the DEBTOR on behalf of CIE and HoldCo.

The TRUSTEE brought this adversary proceeding in two counts to recover payments totaling $95,625, made by the DEBTOR to OBERLANDER on the HoldCo note, as fraudulent transfers under the Illinois Uniform Fraudulent Transfer Act (IUFTA), asserting that the payments constituted fraud in law.[4] 740 ILCS 160/5(a)(2) and 6(a). Sections 160/5(a)(2) and 6(a) set forth the requirements for establishing fraud in law. Under section 160/5(a)(2), it must be established that the transferor made a transfer without receiving a reasonably equivalent value in exchange, and the transferor failed to retain sufficient property to pay his existing or anticipated indebtedness. Section 160/6(a) necessitates that at the time of the transfer, the transferor was insolvent or made insolvent as a result of the transfer. *See Scholes v. Lehmann*, 56 F.3d 750, 756 (7th Cir. 1995).

In September, 2011, the TRUSTEE filed a motion for summary judgment, contending that the DEBTOR became insolvent on August 15, 2005, and that it did not receive equivalent value in exchange for the payments made on the HoldCo note. The TRUSTEE relied on the report of Neil Gerber, the expert he engaged to conduct an insolvency analysis of the DEBTOR.

---

[4]There are two types of fraud under the IUFTA, actual fraud or "fraud in fact," and constructive fraud or "fraud in law." Fraud in law, unlike fraud in fact, does not require proof of fraudulent intent. The TRUSTEE has not alleged that the transfers were actually fraudulent.

Because the DEBTOR'S solvency or insolvency at specific times before the date of the filing of the petition was regarded as a primary issue in most of the pending adversary proceedings, the Court held consolidated hearings on that separate issue. The parties have engaged in extensive discovery and the TRUSTEE'S expert is preparing a supplemental report. The TRUSTEE has also retained an appraisal expert. The TRUSTEE has represented that he intends to have Mr. Gerber prepare *pro forma* balance sheets for the DEBTOR for each transfer date, incorporating both his supplemental report and the appraisal information. After reviewing that information, pursuant to Fed.R.Civ.P. 26(b)(4), the defendants in those proceedings will have an opportunity to take depositions before they are required to make disclosure of their experts, if any. No deadlines have yet been set by the Court for designating experts. Though no order has been entered, the TRUSTEE'S motion for summary judgment has been held in abeyance pending completion of the discovery process.

OBERLANDER filed its amended motion for summary judgment, which is presently before the Court, contending that the transfers it received are not fraudulent because the DEBTOR received reasonably equivalent value in exchange for the challenged transfers, either as a direct or indirect benefit. In support of its motion, OBERLANDER submits the depositions of Mike Smith, the DEBTOR'S President and Chief Executive Officer, as well as CIE'S General Manager, and of Neil Gerber, the TRUSTEE'S expert.

*Analysis*

Under Federal Rule of Civil Procedure 56(c), made applicable to adversary proceedings in bankruptcy by Federal Rule of Bankruptcy Procedure 7056, summary judgment is proper if the pleadings, depositions, answers to interrogatories, and admissions on file, together with

any affidavits, show that there is no genuine issue of material fact and that the moving party is entitled to judgment as a matter of law. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). In order to prevail on a motion for summary judgment, the moving party must establish there is no genuine issue of material fact as to any essential element of the claim. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 255, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). When a moving party has met its initial burden of showing there is no genuine issue of material fact, the burden shifts to the non-movant to go beyond the pleadings and come forward with specific facts showing that there is a genuine issue for trial. Inferences to be drawn from underlying facts must be viewed in the light most favorable to parties opposing the motion. *In re Chambers*, 348 F.3d 650 (7th Cir. 2003). A material factual dispute is sufficient to prevent summary judgment only when the disputed fact is determinative of the outcome under applicable law. It is not the role of the trial court to weigh the evidence or to determine its credibility, and the moving party cannot prevail if any essential element of its claim for relief requires trial. *Anderson*, 477 U.S. at 249, 106 S.Ct. at 2511.

At issue in this amended motion for summary judgment is only whether the DEBTOR received reasonably equivalent value in exchange for its payments to OBERLANDER on the HoldCo note. The term "reasonably equivalent value" is not defined in either the IUFTA or the Bankruptcy Code. In determining whether reasonably equivalent value was received under the IUFTA, courts consider how that phrase has been construed under the Bankruptcy Code. *Creditor's Committee of Jumer's Castle Lodge, Inc. v. Jumer*, 472 F.3d 943 (7th Cir. 2007); *In re Image Worldwide, Ltd.*, 139 F.3d 574, 577 (7th Cir. 1998). The determination of whether a debtor received reasonably equivalent value in exchange for a transfer does not require a

dollar-for-dollar equivalency.  *Barber v. Golden Seed Co., Inc.,* 129 F.3d 382, 387 (7th Cir. 1997).

This determination is a two-step inquiry.  *In re Phillips*, 379 B.R. 765, 779 (Bankr.N.D.Ill. 2007).

First, the court must determine that a debtor received some value.  Value can be in the form

of either a direct economic benefit or an indirect economic benefit.  In order to suffice as

reasonably equivalent value, indirect benefits must be fairly concrete and identifiable.  Indirect

benefits can include a wide range of intangibles, including a corporation's goodwill, the

general relationship between affiliates or "synergy" within a corporate group as a whole, and

the ability to pay present debts or to otherwise remain in business.  *See In re Image Worldwide*

*Ltd.*, 139 F.3d at 581.  Taking a holistic approach, courts consider the overall effect on the

transferor entity.  *In re Crystal Medical Products, Inc.,* 240 B.R. 290 (Bankr.N.D.Ill. 1999).

   Only if the court determines that value has been received, does the court turn to an

examination of whether the value received was reasonably equivalent to what the debtor gave

up.  *In re Renegade Holdings, Inc.,* 457 B.R. 441 (Bankr.M.D.N.C. 2011).  Important here, the

reasonable equivalence of the value is measured as of the time of the transfer.  *In re Gluth Bros.*

*Const., Inc.,* 424 B.R. 368, 376 (Bankr.N.D.Ill. 2009).  Finally, the issue of reasonably equivalent

value is determined on the facts and circumstances of each case.  *In re 4100 West Grand LLC,*

481 B.R. 444 (Bankr.N.D.Ill. 2012).

   As a general rule, a fraudulent transfer occurs when a debtor pays the debt of another,

when the debtor itself is not obligated on the debt.  *In re Integrated Agri, Inc.,* 2005 WL 3088612

(Bankr.C.D.Ill. 2005).  That rule is not without qualification.  Two exceptions are involved here.

Under the first, a debtor may receive value in the form of the third party's agreement to

reimburse the debtor.  *In re Central Illinois Energy Co-op.,* 2011 WL 5080147 (Bankr.C.D.Ill. 2011).

9

The second recognized exception is where the debtor benefits indirectly from paying the debt of a related third party. *See In re Nat. Century Fin. Enterprises, Inc.,* 341 B.R. 198, 215-16 (Bankr.S.D.Ohio 2006).

### *Unity of Interest/Alter Ego Doctrine*

OBERLANDER, in its amended motion, starts out with the assertion that the DEBTOR received a direct and equal benefit by making the payments on the HoldCo note because CIE, HoldCo and the DEBTOR shared such an identity of interest and commonality of ownership and management that the companies were, in actuality, parts of the same entity.  Under OBERLANDER's theory, the DEBTOR was simply paying a common debt, thus receiving a direct benefit.  In support of its position, which calls for an alter ego analysis, OBERLANDER relied on the following factors: common office space and  common management in Mike Smith; HoldCo's lack of employees; overlapping directorate; identical business purpose; and use of common letterhead.

In response, the TRUSTEE, relying on the fundamental principle of the separateness of corporate entities, points out that, apart from the DEBTOR advancing funds on behalf of HoldCo and CIE, there was no commingling of funds; each of the three entities observed corporate formalities; each filed separate tax returns and each maintained separate balance sheets.  The TRUSTEE maintains that the "unity of interest" rule is limited to where the entities have an absolute unity of ownership, an attribute lacking in this case.[5]

This Court agrees with the TRUSTEE that OBERLANDER has failed to establish that the DEBTOR'S separateness should be disregarded.  Alter ego is an extreme remedy, and one

---

[5]The parties quibble over the number of common directors of the DEBTOR and HoldCo.  OBERLANDER asserts that on the date HoldCo and CIE became operative, seven of the ten members serving on HoldCo's board also served on the DEBTOR'S board.  The TRUSTEE maintains that the composition of the companies' directors would only be relevant on the dates the payments were made.

that is rarely invoked. *In re American Intern. Refinery*, 402 B.R. 728 (Bankr.W.D.La. 2008). A determination that corporate affiliates are engaged in a common enterprise is hardly sufficient to compel the conclusion that those companies are alter egos. Moreover, the existence of intercompany obligations/advances, even where not properly accounted for, is not atypical in an affiliated group of companies, and is not cause for disregarding the separateness of the entities. *In re Owens Corning*, 419 F.3d 195, 215 (3rd Cir. 2005).

The predominant function of the common law alter ego doctrine is to set aside the liability shield afforded by the separate entity in order to hold its owners personally liable for the entity's debts. *Koch Refining v. Farmers Union Cent. Exchange, Inc.*, 831 F.2d 1339, 1344 (7th Cir. 1987). OBERLANDER is not acting as a creditor seeking to use the alter ego doctrine as a debt collection device. Instead, its use of the doctrine is defensive, to escape liability as an initial transferee under section 550(a)(1), on the theory that if the DEBTOR and HoldCo are treated as a single entity, the payment to OBERLANDER was simply discharging the DEBTOR'S own debt.

As this Court has recently reasoned, the transfer avoidance and liability provisions of the Bankruptcy Code incorporate, and depend upon, the separate existence of corporate entities under applicable state statutes. Liability for an avoided transfer can stand or fall on whether a defendant is an initial transferee, an immediate transferee or a mediate transferee. As such, if the alter ego doctrine has any application in bankruptcy at all, it should be applied with extreme caution so as not to override the transfer avoidance and liability scheme adopted by Congress. *In re Duckworth*, 2012 WL 4434681 (Bankr.C.D.Ill. 2012).

Apart from the tenuousness of the alter ego doctrine as a permissible remedy in the context in which it is sought to be used by OBERLANDER, the facts in the record do not

support its usage.  The record is clear that the DEBTOR and HoldCo were separate entities that were validly formed and existing under state law.  All applicable formalities were followed. Moreover, the evidence in the record indicates that HoldCo was formed and used as a holding company as a requirement imposed by Credit Suisse.  So it was important to the DEBTOR, HoldCo and CIE that the separation among entities be maintained.  Collapsing or ignoring the boundaries would likely have jeopardized the relationship with the ethanol plant's primary financier.  The record does not support OBERLANDER'S proposed use of the alter ego doctrine to recharacterize the HoldCo note as a debt of the DEBTOR.

### *Direct Benefit*

OBERLANDER contends that the DEBTOR received reasonably equivalent value in exchange for the payments it made on the HoldCo note, based upon the resolution of HoldCo's Board of Directors to reimburse the DEBTOR for advances made on HoldCo's behalf.  OBERLANDER submits a memorandum of action, signed by HoldCo's directors, dated April 7, 2006, which provides as follows:

> RESOLVED, that [the DEBTOR] has advanced certain project expenses on behalf of [HoldCo] as set forth on Attachment A hereto, and that [the DEBTOR] shall be reimbursed for said expenses, together with interest accrued at the rate of 10% per annum from [HoldCo's] "cash flow", as that term is defined in [HoldCo's] Limited Liability Company Agreement, before the payment of any distributions to the holders of common membership interest.
> * * * *
> RESOLVED, that [the DEBTOR] has committed to advance certain project expenses on behalf of [HoldCo] as set forth on Attachment B hereto, and to the extent that [the DEBTOR] makes such advances on behalf of [HoldCo] or any other advances of funds on behalf of HoldCo, [the DEBTOR] shall be reimbursed for said expenses, together with interest accrued at the rate of 10% per annum from [HoldCo's] "cash flow", as that term is defined in [HoldCo's] Limited Liability Company Agreement, before the payment of any distributions to the holders of common membership interests.

A similar resolution providing for reimbursement of expenses advanced by the DEBTOR on

behalf of CIE was passed by the directors of CIE.

Focusing on the DEBTOR'S expectation of repayment at the various times that the payments were made, OBERLANDER contends that the DEBTOR'S belief that the ethanol plant would be completed and become operational was not unreasonable throughout that time period.  OBERLANDER points to the fact that CIE actually made a series of payments to the DEBTOR in reimbursement of expenses advanced.[6]  CIE's reimbursements to the DEBTOR continued until at least August 6, 2007, nearly five months after the DEBTOR'S last payment to OBERLANDER.  In his deposition, Gerber admitted that the monthly progress report prepared by R.W. Beck, the project's independent engineer, for the period ending August 31, 2006, disclosed a budgeted contingency of $4.4 million.[7]  The report noted that rather than drawing on the contingency to cover the budget overrun of $3.2 million, the DEBTOR was going to seek additional funding.  The report indicated that there were no evident areas of concern.  Smith testified in his deposition that he did not perceive that there was a potential problem until the fall of 2006, at which time Lurgi began to fall behind on the construction schedule and corn prices spiked.  Smith denied that CIE began to contemplate filing bankruptcy in early 2007.

The TRUSTEE maintains, in the absence of any evidence of HoldCo's actual ability to reimburse the DEBTOR, its argument must fail.  The TRUSTEE points to the additional obligation undertaken by the DEBTOR, to advance cost overruns and the expense of change

---

[6]The DEBTOR'S general ledger included separate accounts for intercompany transactions between the DEBTOR and CIE and the DEBTOR and HoldCo.  Based on his examination of the DEBTOR'S books and records, Gerber prepared a schedule of transactions between the DEBTOR and CIE, concluding in his report that advances made by the DEBTOR to CIE after August 6, 2007, were not reimbursed.  Although the DEBTOR made advances on behalf of HoldCo, there is no evidence that reimbursements were ever made by HoldCo to the DEBTOR.  According to the DEBTOR'S general ledger, advances to HoldCo totaled $306,000 as of October 31, 2007.

[7]R. W. Beck performed a monthly analysis throughout the construction period.

orders incurred by CIE on the construction of the ethanol plant. The reimbursement of those advances were also to be paid by HoldCo, through income generated by CIE, on a subordinated basis. The TRUSTEE opines that the DEBTOR could have had no reasonable expectation of reimbursement, because its chances were next to none, given that project overruns totaled $3,545,985 in July, 2006, and continued to mount. The TRUSTEE relies on the opinion of his expert, who regards the project as having been doomed from its very start. According to Gerber, there was never sufficient equity in the project. Summing up his position, he stated: "They had less than 10 percent equity in this, and then you're turning around and borrowing $100 million at 10 to 15% . . . If you don't have the financing and the resources on hand, you can never finish it. If you can't finish it, it's never operational. If it's never operational, it's never going to be able to pay anybody."

While the mere opportunity to receive an economic benefit in the future may constitute "value" for purposes of a constructive fraud analysis, *In re R.M.L., Inc.,* 92 F.3d 139, 148 (3rd Cir. 1996), the more difficult issue is quantifying, for reasonable equivalency purposes, the value, as of the date of each transfer, of an unsecured promise of future payment in light of the risk that the promisor may be unable to pay when the obligation comes due. A determination of whether HoldCo's unsecured agreement to reimburse the DEBTOR for advances it made on behalf of HoldCo constitutes reasonably equivalent value in exchange for those payments, requires an examination of HoldCo's financial circumstances to ascertain the likelihood of repayment. *See In re Advanced Telecommunication Network, Inc.*, 490 F.3d 1325, 1337 (11th Cir. 2007); *In re USA Commercial Mortg. Co.*, 439 Fed.Appx. 670 (9th Cir. 2011); *Caterpillar, Inc. v. Jerryco Footwear, Inc.*, 880 F. Supp. 578, 592 (C.D.Ill. 1994); *In re Nat. Century Financial Enterprises, Inc.*, 341 B.R. 198, 218 (Bankr.S.D.Ohio 2006). HoldCo's agreement to reimburse

14

the DEBTOR must be based on a legitimate and reasonable chance of repayment, in order to be of reasonably equivalent value.  *See, R.M.L., Inc.*, 92 F.3d at 152.

In this Court's view, a subjective expectation on the DEBTOR'S part is not enough. There is evidence in the record, however, viewed objectively, which supports OBERLANDER'S position.  The payments at issue in the present case began in May, 2006, the same month in which construction was begun by Lurgi on the ethanol plant, and just one month following Credit Suisse's commitment to provide financing of $87.5 million.  Despite Gerber's fatalistic opinion that the project was dead on arrival, construction of the ethanol plant proceeded throughout the period that the payments at issue in this proceeding were made.  The fact that a consortium of sophisticated lenders headed by Credit Suisse agreed to invest $87.5 million in the project as of April, 2006, undercuts Gerber's opinion.

The Court is required to construe the  facts in a light most favorable to the TRUSTEE and to draw all legitimate inferences and resolve all doubts in his favor.  It is clear to the Court, considering the summary judgment evidence presented, that whether HoldCo's agreement to reimburse the DEBTOR for the payments it made to OBERLANDER on the HoldCo note, constituted reasonably equivalent value for those payments presents a disputed, material question of fact.  Valuation determinations are implicitly fact-laden, and the issue presented in this proceeding presents no exception.

Based on the current record, it is proper to treat each loan payment made to OBERLANDER by the DEBTOR as creating an account receivable from HoldCo.  Receivables are typically valued on the basis of their collectibility, and may be discounted where the evidence demonstrates a substantial risk of nonpayment. *See Constructora Maza, Inc. v. Banco*

15

*de Ponce,* 616 F.2d 573, 577 (1st Cir. 1980). At this point, the record contains little objective

evidence of the likelihood, between May, 2006, and March, 2007, that HoldCo would be able

to repay the payments made by the DEBTOR to OBERLANDER. The value of those HoldCo

receivables and whether that value was "reasonably equivalent" are unresolved questions of

material fact that preclude summary judgment.

***Indirect Benefit***

Refining its first argument in its reply to the TRUSTEE'S response to its motion,

OBERLANDER relies on the "identity of interest" exception, maintaining that based on the

shared interests of the DEBTOR, HoldCo and CIE, the payments on the HoldCo note,

necessarily benefitted the DEBTOR, albeit indirectly, by reason of the entities' common

enterprise. Had those payments not been timely made, OBERLANDER regards it as unlikely

that any of the entities would have been able to secure additional funds to continue the

construction of the ethanol plant, without which, all three entities would have failed.

OBERLANDER maintains, at the time relevant to this proceeding, the DEBTOR, HoldCo and

CIE had a complete unity of interest and singleness of purpose: the construction of an ethanol

plant. It was only upon its completion and commencement of operations that the interests of

the three companies would diverge.

In his response to OBERLANDER'S amended motion, the TRUSTEE focuses upon

OBERLANDER'S original position involving the "unity of interest" rule. Just as

OBERLANDER had done, the TRUSTEE addressed the "identity of interest" rule in only a

cursory fashion, concluding that material issues of fact exist concerning both the nature and

identity of the interests shared by the DEBTOR and HoldCo and the solvency of HoldCo. Part

of the confusion results from the parties referring to the terms "unity of interest" and "identity

of interest" interchangeably.   The "unity of interest" rule is associated with the alter ego

doctrine, which is an equitable remedy which may be applied when there is such a unity of

interest and ownership which exists between corporate entities to justify disregarding  their

separate personalties and treating them as a single entity and the adherence to the fiction of

separate corporate existence would sanction a fraud or promote injustice. *Sea-Land Services, Inc.*

*v. Pepper Source*, 941 F.2d 519 (7th Cir. 1991).   In contrast, the "identity of interest" doctrine

recognizes that if the debtor and affiliated entities are engaged in a common enterprise such

that they share an "identity of interests," then what benefits one entity may in fact benefit

another to a degree sufficient to establish reasonably equivalent value.   *In re Ear, Nose and*

*Throat Surgeons of Worcester, Inc.*, 49 B.R. 316, 320 (Bankr.D.Mass. 1985).

OBERLANDER contends that the DEBTOR received an indirect benefit from paying

HoldCo's note, postulating that by making the payments, the DEBTOR "increased its goodwill,

the goodwill of the corporate enterprise as a whole, and put itself and the corporate group as

a whole in a better position."   In its reply, OBERLANDER argues that the DEBTOR and

HoldCo shared an identity of interest so that the DEBTOR received an indirect economic

benefit from paying the HoldCo note "because the operational ethanol plant both companies

relied upon could not come to fruition unless the build could be completed."

The evidence and the inferences that must be drawn in favor of the TRUSTEE, however,

undercut OBERLANDER'S theory.  First, it is undisputed that the payments to OBERLANDER

were made well before they were actually due.   The HoldCo note does not require any

payments to OBERLANDER until the first day of the third month following "Interim

Completion" of the ethanol plant as defined in the EPC Agreement.  The payments began in

the month following the closing of Credit Suisse's $87 million construction loan, long before

Interim Completion.[8]

Second, it may be inferred that the April 21, 2006, loans from OBERLANDER, Core

Construction and Illinois Piping, among others, the proceeds of which were paid to CIE, were

required by Credit Suisse.  It may also be inferred that the HoldCo note's provision deferring

any payments until after Interim Completion was a condition imposed by Credit Suisse and

agreed to by OBERLANDER (and separately by Core Construction and Illinois Piping).  It is

undisputed that the sums advanced by OBERLANDER (and Core Construction and Illinois

Piping) as of April 21, 2006, were loans in the nature of capital contributions.

Third, there is no evidence in the record that would support an inference that the

DEBTOR'S payments to OBERLANDER were necessary or beneficial to the completion of

either the ethanol plant or the grain handling facility.  To the contrary, the evidence supports

an inference that repayment of OBERLANDER'S loan was gratuitous since it was paid before

it came due, was unrelated to the progress of the construction projects and depleted the

DEBTOR'S scarce cash reserves.  The evidence also supports the reasonable inference that the

HoldCo note payments were made by the DEBTOR because Credit Suisse would not have

approved any such payments by HoldCo.

Fourth, OBERLANDER'S contention that the three entities shared an identical interest

during the pre-operational stage with divergent interests thereafter is not the only possible or

even the most valid interpretation of the evidence.  The record before the Court supports the

conclusion that the two construction projects – the ethanol and power plant on the one hand,

---

[8]In his deposition, Mike Smith stated that "Interim Completion" referred to that point when the ethanol plant was
producing alcohol, but was not necessarily complete.

and the grain handling facility and administration building on the other – were being developed as related but separate projects.  CIE and HoldCo were responsible for the ethanol side while the DEBTOR was responsible for the grain handling side.  Separate construction contracts were formed with different contractors.  Most importantly, the two projects were financed separately, with Credit Suisse closely restricting the use of its funds to the ethanol plant project.  After the development became operational, the sole source of revenue was to be from the sale of ethanol and byproducts.  A fair interpretation of the evidence is that during the construction stage, the DEBTOR'S primary function – constructing the grain handling facility and administration building – was separate and discrete; only when the ethanol plant became operational would the interests of the three entities have converged in reliance on a single source of income.

Fifth, the fact that the DEBTOR held a majority share of the membership of HoldCo is not inconsistent with the foregoing, since the value of the ownership interest was a future interest that would only be realized when revenue was generated from the production and sale of ethanol.  Moreover, during the construction phase, despite its majority interest in HoldCo (and derivatively in CIE), the DEBTOR had little practical or effective control over either entity.  As holder of the purse strings, Credit Suisse ran the ethanol and power plant construction project and approved all expenditures.  While the DEBTOR'S domination of HoldCo's and CIE's boards of directors may have given it control of those entities on paper, Credit Suisse held the real power during the construction phase.[9]  Under these circumstances, the fact that

---

[9]The DEBTOR dominated the boards of directors of both HoldCo and CIE.  According to the limited liability company agreement of HoldCo, the DEBTOR had the exclusive right to appoint seven directors.  HWS, Lurgi, FFF and Whitebox each had the exclusive right to appoint one director.  According to CIE's limited liability agreement, the DEBTOR had the exclusive right to appoint six directors.  HWS, Lurgi, FFF and Whitebox each had the exclusive right to appoint one director.  HoldCo was required to appoint one independent director.  Both agreements provide that a quorum of the

the DEBTOR owned a controlling interest in HoldCo provides no significant support to OBERLANDER'S theory that they shared an identity of interest for equivalent value purposes.

It thus appears that OBERLANDER'S contention that the DEBTOR'S payments on the HoldCo note, commencing in May, 2006, were necessary to keep the ethanol plant construction project going is not supported by the record. The payments were not due when paid – they were voluntary prepayments.[10]  The payments were not due in payment of any work performed or to be performed on the construction project. And the payments contravened the terms of the debt instrument, that contemplated the loans would be repaid by HoldCo and only after Interim Completion had been achieved. The Court fails to see how the DEBTOR'S payments to OBERLANDER benefitted the project or furthered its completion. Even if the DEBTOR and HoldCo shared a common interest in completion of the ethanol plant, OBERLANDER has failed to show that the DEBTOR'S payments on the HoldCo note were in furtherance of that common objective.  Absent an identifiable economic benefit, OBERLANDER cannot prevail on its motion for summary judgment or its identity of interest theory.

*Conclusion*

For the foregoing reasons, OBERLANDER'S amended motion for summary judgment will be denied. In this Court's view, the evidence in the record strongly militates against

---

board of directors consists of a majority of the number of directors in office.

[10]There is no evidence in the present record that the DEBTOR obligated itself to OBERLANDER to make the payments, which could change the analysis entirely. Mike Smith referred only to an agreement between the DEBTOR and Illinois Piping. (Smith Dep., pp. 55-56).  If there was an enforceable agreement, the payments likely could not have been constructively fraudulent.

piercing the DEBTOR'S "corporate veil" or otherwise collapsing or ignoring the separate entity status of the DEBTOR, or treating the DEBTOR and HoldCo as having an identity of interest for equivalent value purposes.   Unless OBERLANDER seeks to prove that the DEBTOR undertook an obligation to make the challenged payments to OBERLANDER on the HoldCo note, the issues going forward are whether HoldCo's promise to reimburse the DEBTOR had value at the time each payment was made and, if so, whether that value was reasonably equivalent to the payments made by the DEBTOR to OBERLANDER.

This Opinion constitutes this Court's findings of fact and conclusions of law in accordance with Federal Rule of Bankruptcy Procedure 7052.   A separate Order will be entered.

###